## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**TYLER YZAGUIRRE**               )
40 Quincy Place, NE               )
Washington, DC 20002              )
                                  )
**SECOND AMENDMENT INSTITUTE**    )
40 Quincy Place, NE               )
Washington, DC 20002              )
                                  )
**G & D LLC**                     )
1317 F St. NW Suite 700           )
Washington, DC 20004              )
                                  )
                  Plaintiffs,     )
                                  )
               v.                 )        Case No. 2024-cv-1828
                                  )
**DISTRICT OF COLUMBIA**          )
Serve Office of the Attorney General )
400 6th Street NW                 )
Washington, DC 20001              )
                                  )
**CHIEF PAMELA A. SMITH**         )
300 Indiana Avenue, NW            )
Washington, DC 20001              )
                                  )
                  Defendants.     )

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

Plaintiffs Tyler Yzaguirre, Second Amendment Institute ("SAI") and G & D LLC ("G&D"), by and through their attorneys, bring this action against Defendants District of Columbia ("DC" or the "District") and Metropolitan Police Chief Pamela A. Smith ("Chief").

### Introduction.

1.     The Second Amendment to the United States Constitution guarantees "the right of the people to keep and bear Arms." U.S. CONST. amend. II.

2.      Despite the Constitution's unambiguous text and binding Supreme Court precedent (including the Supreme Court's decision in *New York State Rifle and Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022)), the District categorically bans possessing, selling, transferring, purchasing, and receiving, constitutionally protected arms commonly possessed and used for lawful purposes, under pain of criminal sanctions (the "Ban").

3.      Defendants have and will continue to enforce the District's Ban on the keeping and bearing of common semiautomatic firearms—tendentiously labeled "assault weapons"—by ordinary peaceable citizens, thereby making it a crime for law-abiding citizens to exercise their fundamental right to keep and bear such arms.

4.      Defendants' enforcement of its Ban on commonly possessed semiautomatic firearms denies otherwise law-abiding citizens who reside in the District, including individual Plaintiff Yzaquirre and members of SAI, their fundamental, individual right to keep and bear commonly possessed arms.

5.      By effecting a total and complete prohibition on a substantial set of semiautomatic firearms, a common and popular category of arms, *see, e.g.*, *Garland v. Cargill*, 602 U.S. ___ (2024) (Sotomayor, J., dissenting) (acknowledging that "semiautomatic rifles" like the AR-15 are "commonly available"), the District's Ban violates the Second Amendment.

6.      In *Bruen*, the Supreme Court expressly rejected all interest balancing, including the D.C. Circuit's previous "two-step" approach in the context of Second Amendment claims. Specifically, "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."

2

142 S. Ct. at 2127. Rather, "*Heller* . . . demands a test rooted in the Second Amendment's text, as informed by history." *Id*.

7.      *Bruen* did not create a new test, but instead applied the very test the Court established in *District of Columbia v. Heller*, 554 U.S. 570 (2008). "The test that [the Court] set forth in *Heller* and appl[ies] today [in *Bruen*] requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen*, 142 S. Ct. at 2131.

8.      "*Heller*'s methodology centered on constitutional text and history. Whether it came to defining the character of the right (individual or militia dependent), suggesting the outer limits of the right, or assessing the constitutionality of a particular regulation, *Heller* relied on text and history. It did not invoke any means-end test such as strict or intermediate scrutiny." *Id*. at 2128-29.

9.      Post-*Bruen*, "the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with this Nation's historical tradition of firearm regulation." 142 S. Ct. at 2126.

10.     Here, the plain text of the Second Amendment covers the conduct Plaintiffs wish to engage in ("keep and bear arms"), and the arms they wish to keep and bear because "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms." 142 S. Ct., at 2132.

11.     *Heller* has already established the relevant contours of the historic tradition: bearable arms that are presumptively protected by the Second Amendment cannot be banned unless they are both dangerous and unusual.

12.    Arms that are in common use—such as those DC bans—are by definition not unusual. Logically, that which is common cannot be unusual. And because all weapons are dangerous, the dangerous element of the test must refer to a weapon that is *unusually* dangerous, such as bombs, chemical weapons or rocket propelled grenades.

13.    The Second Amendment's "reference to 'arms' does not apply 'only [to] those arms in existence in the 18th century.'" *Bruen*, 142 S. Ct., at 2132 (quoting *Heller*, 554 U.S. at 582). "Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id*. (citations omitted).

14.    "Semiautomatic weapons," such as those proscribed under the District's Ban, "traditionally have been widely accepted as lawful possessions." *Jones v. Bonta*, 34 F.4th 704, 716 (9th Cir. 2022), *vacated on reh'g* 47 F.4th 1124 (quoting *Staples v. United States*, 511 U.S. 600, 612, (1994)) (cleaned up). And "even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense. *Cf. Caetano v. Massachusetts*, 577 U.S. 411, 411-12 (2016) (per curiam) (stun guns)." *Id*.

15.    In this case, the analysis is straightforward: The District may not prohibit Plaintiffs from exercising their right to keep and bear commonly possessed arms. The Second Amendment's text encompasses the conduct Plaintiffs wish to engage in and the arms they wish to acquire and possess. The arms Plaintiffs wish to acquire and possess are not dangerous and unusual today. And beyond the Supreme Court's common possession test, there is no analogous history conceivably supportive of the District's categorical Ban.

16.     Thus, under Supreme Court precedents and  constitutionally relevant history, Plaintiffs must prevail.

17.     Plaintiffs therefore bring this challenge to vindicate their rights, and to preliminarily and permanently enjoin enforcement of the District's Ban on constitutionally protected arms.

### Jurisdiction and Venue.

18.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343, which confer original jurisdiction on federal district courts to hear suits alleging the violation of rights and privileges under the United States Constitution.

19.     This action, based on a violation of Plaintiffs' constitutional rights, is brought under 42 U.S.C. § 1983 and seeks declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, as well as attorneys' fees, costs and damages under 42 U.S.C. § 1988.

20.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in the District of Columbia.

### Parties.

21.     Plaintiff Yzaguirre is a natural person and a citizen of the District.

22.     Plaintiff G&D is a limited liability company organized under the laws of the District of Columbia and a federal firearms licensee ("FFL") whose principal place of business is in the District.

23.     Plaintiff SAI is a 501(c)(3) non-profit organization incorporated under the laws of Delaware with its principal place of business in the District.

24.     Defendant District of Columbia is a jural entity established under the Constitution of the United States as the seat of government of the Nation.

25.     Defendant Smith is Chief of the District of Columbia Metropolitan Police Department ("MPD") and is responsible for overseeing, implementing, and enforcing the District's Ban, regulatory programs, and related policies, practices, and customs designed to propagate the same. Defendant Smith is sued in her official capacity as Chief of MPD.

### Statement of Facts.

### Facts Relating to All Plaintiffs.

26.     Unless and until enjoined, Defendants' active enforcement of the District's Ban has violated and will continue to violate Plaintiffs' fundamental, individual right to keep and bear arms.

### Facts Relating to Plaintiff Yzaguirre.

27.     Plaintiff Yzaguirre is a resident of the District and a peaceable citizen not disqualified from exercising his Second Amendment right to possess firearms and ammunition.

28.     Plaintiff Yzaguirre holds an MPD concealed pistol carry license and multiple handgun registration certificates.

29.     Plaintiff Yzaguirre is not a licensed firearms manufacturer, importer, or dealer.

30.     Plaintiff Yzaguirre is a member of Plaintiff SAI.

31.     As a male between the ages of 17 and 44, Plaintiff Yzaguirre is a member of the militia of the United States of America and of the District's militia. *See* 10 U.S.C. § 246.

32.     Plaintiff Yzaguirre owns an AR-15 rifle that he acquired in an FFL transaction while a resident of the State of Delaware.

33.     Plaintiff Yzaguirre sought to register his AR-15 with MPD so that he could possess the firearm within the District for personal protection in his home and for other lawful purposes such as target shooting.

34.   MPD denied his registration application, citing the District's Ban on "assault weapons."

35.   Plaintiff Yzaguirre would possess his AR-15 in the District but declines to do so for fear of prosecution for possession of an unregistered firearm, a law the District regularly and aggressively enforces.

**Facts Relating to Plaintiff G&D.**

36.   Plaintiff G&D is federally licensed by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") as an FFL, which means it is legally able to sell and transfer firearms in the District. Plaintiff G&D also holds a DC license as a firearms dealer.

37.   Many customers and prospective customers of Plaintiff G&D have sought to purchase constitutionally protected firearms that the District bans as assault weapons.

38.   But for the District's Ban on common semiautomatic firearms and Defendants' active enforcement thereof (which Plaintiff G&D reasonably fears), Plaintiff G&D would make available for sale and transfer to its customers any and all of the semiautomatic firearms on the market that are available and commonly possessed outside of the District.

39.   As a result of the District's Ban, G&D has had to turn away prospective customers seeking to purchase and possess arms subject to the District's Ban and has thus lost sales and revenue.

**Facts Relating to Plaintiff SAI.**

40.   The mission of Plaintiff SAI includes defending and promoting the People's rights, especially, but not limited to, the fundamental, individual Second Amendment right to keep and bear arms.

41.     Plaintiff SAI has members in the District, including Plaintiff Yzaguirre, who wish to lawfully keep and bear commonly possessed arms the District bans.

42.     Plaintiff SAI serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs.

43.     SAI represents its members who include gun owners, prospective gun owners, and others who engage in the exercise of the right to keep and bear arms, and brings this action on behalf of them, including Plaintiff Yzaguirre.

44.     SAI's members residing in the District, including Plaintiff Yzaguirre, have been and will continue to be adversely and directly harmed by Defendants' administration, implementation, and enforcement of the laws, and related regulations, policies, practices, and customs challenged herein and will otherwise remain so absent relief from this Court.

45.     Like Plaintiff Yzaguirre, many of Plaintiff SAI's District resident members desire and intend to acquire, possess, and lawfully use semiautomatic firearms the District bans as "assault weapons" but which are otherwise commonly possessed and used for self-defense and other lawful purposes.

46.     SAI reasonably fears the prosecution of its District resident members by and through Defendants' administration, implementation, and enforcement of the laws, regulations, policies, practices, and customs challenged herein.

47.     Based on the active threat of prosecution by the District, SAI's District resident members have been prevented from, *inter alia*, possessing, acquiring, receiving or lawfully using commonly possessed firearms the District bans and labels as "assault weapons."

**The Second Amendment Right to Keep and Bear Arms**

48.     The Second Amendment to the United States Constitution provides that "[a] well regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed." U.S. CONST. amend. II.

49.     The Second Amendment guarantees "an individual right to keep and bear arms." *Heller*, 554 U.S. at 595. It is "a fundamental constitutional right guaranteed to the people," *id*., which is and has always been key to "our scheme of ordered liberty," *McDonald,* 561 U.S. 742, 767-68 (2010).

**DC's Unconstitutional Ban on So-Called "Assault Weapons."**

50.     D.C. Code § 7-2501.01 defines "assault weapons" as follows:

As used in this unit the term:

(3A)(A) "Assault weapon" means:

>     (i)     The following semiautomatic firearms:

>         (I)     All of the following specified rifles:

>             (aa)     All AK series including, but not limited to, the models identified as follows:

>                 (1)     Made in China AK, AKM, AKS, AK47, AK47S, 56, 56S, 84S, and 86S;
>                 (2)     Norinco (all models);
>                 (3)     Poly Technologies (all models);
>                 (4)     MAADI AK47 and ARM; and
>                 §(5)     Mitchell (all models).

>             (bb)     UZI and Galil;

>             (cc)     Beretta AR-70;

>             (dd)     CETME Sporter;

>             (ee)     Colt AR-15 series;

(ff)    Daewoo K-1, K-2, Max 1, Max 2, AR 100, and AR110 C;

(gg)    Fabrique Nationale FAL, LAR, FNC, 308 Match, and Sporter;

(hh)    MAS 223.

(ii)    HK-91, HK-93, HK-94, and HK-PSG-1;

(jj)    The following MAC types:

        (1)    RPB Industries Inc. sM10 and sM11; and
        (2)    SWD Incorporated M11;

(kk)    SKS with detachable magazine;

(ll)    SIG AMT, PE-57, SG 550, and SG 551;

(mm)    Springfield Armory BM59 and SAR-48;

(nn)    Sterling MK-6;

(oo)    Steyer AUG, Steyr AUG;

(pp)    Valmet M62S, M71S, and M78S;

(qq)    Armalite AR-180;

(rr)    Bushmaster Assault Rifle;

(ss)    Calico —900;

(tt)    J&R ENG —68; and

(uu)    Weaver Arms Nighthawk.

(II) All of the following specified pistols:

(aa)    UZI;

(bb)    Encom MP-9 and MP-45;

(cc)    The following MAC types:

        (1)    RPB Industries Inc. sM10 and sM11;

       (2)     SWD Incorporated -11;

       (3)     Advance Armament Inc. —11; and

       (4)     Military Armament Corp. Ingram M-11;

(dd)     Intratec TEC-9 and TEC-DC9;

(ee)     Sites Spectre;

(ff)     Sterling MK-7;

(gg)     Calico M-950; and

(hh)     Bushmaster Pistol.

(III)     All of the following specified shotguns:

     (aa)     Franchi SPAS 12 and LAW 12; and

     (bb)     Striker 12. The Streetsweeper type S/S Inc. SS/12;

(IV)     A semiautomatic, rifle that has the capacity to accept a detachable magazine and any one of the following:

     (aa)     A pistol grip that protrudes conspicuously beneath the action of the weapon;

     (bb)     A thumbhole stock;

     (cc)     A folding or telescoping stock;

     (dd)     A grenade launcher or flare launcher;

     (ee)     A flash suppressor; or

     (ff)     A forward pistol grip;

(V)     A semiautomatic pistol that has the capacity to accept a detachable magazine and any one of the following:

     (aa)     A threaded barrel, capable of accepting a flash suppressor, forward handgrip, or silencer;

     (bb)     A second handgrip;

     (cc)     A shroud that is attached to, or partially or completely encircles, the barrel that allows the bearer

to fire the weapon without burning his or her hand, except a slide that encloses the barrel; or

(dd)    The capacity to accept a detachable magazine at some location outside of the pistol grip;

(VI)    A semiautomatic shotgun that has one or more of the following:

(aa)    A folding or telescoping stock;

(bb)    A pistol grip that protrudes conspicuously beneath the action of the weapon;

(cc)    A thumbhole stock; or

(dd)    A vertical handgrip; and

(VII)    A semiautomatic shotgun that has the ability to accept a detachable magazine; and

(VIII)    All other models within a series that are variations, with minor differences, of those models listed in subparagraph (A) of this paragraph, regardless of the manufacturer;

(ii)    Any shotgun with a revolving cylinder; provided, that this sub-subparagraph shall not apply to a weapon with an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition; and

(iii)    Any firearm that the Chief may designate as an assault weapon by rule, based on a determination that the firearm would reasonably pose the same or similar danger to the health, safety, and security of the residents of the District as those weapons enumerated in this paragraph.

(B) The term "assault weapon" shall not include:

(i)    Any antique firearm; or

(ii)    Any of the following pistols, which are designed expressly for use in Olympic target shooting events, sanctioned by the International Olympic Committee and by USA Shooting, the national governing body for international shooting competition in the United States, and used for Olympic target shooting purposes:

[Listing omitted]

    (C)    The Chief may exempt, by rule, new models of competitive pistols that would otherwise fall within the definition of "assault weapon" pursuant to this section from being classified as an assault weapon. The exemption of competitive pistols shall be based either on recommendations by USA Shooting consistent with the regulations contained in the USA Shooting Official Rules or on the recommendation or rules of any other organization that the Chief considers relevant.

D.C. Code § 7-2502.01(3A).

51.    Under D.C. Code § 7-2502.02(a)(6), firearms designated as assault weapons may not be registered.

52.    Possession of an unregistered firearm is a misdemeanor punishable by up to a year of confinement and/or a $2,500 fine. *See* D.C. Code §§ 7-2507.06(a); 22-3571(a)(5).

**The District Unconstitutionally Bans Protected Arms that are Commonly Possessed.**

53.    The firearms the District bans are semiautomatic rifles, pistols and shotguns with cosmetic features that enhance accuracy or ease of use such as pistol grips and adjustable stocks or other characteristics unrelated to the basic functioning of the firearms.

54.    These features have little-to-no relation to the firing mechanism of the firearm.

55.    The banned firearms include the AR-15 and similar modern sporting rifles ("MSR") sharing ergonomic features common to the AR-15.

56.    Semiautomatic firearms "traditionally have been widely accepted as lawful possessions." *See Staples*, 511 U.S. at 612 (categorizing an AR-15 semiautomatic rifle).

57.    Rifles built on the AR-style platform are paradigmatic of the type of arms the District bans.

58.    AR-15 rifles are among the most popular firearms in the Nation, and they are owned by millions of Americans.

59.     A recent survey of gun owners indicates that about 24.6 million Americans have owned up to 44 million AR-15s or similar rifles. *See* William English, 2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned at 1 (May 13, 2022), https://bit.ly/3yPfoHw.

60.     According to industry sources, more than one out of every five firearms sold just ten years ago was a rifle of the type that the District bans. Nat'l Shooting Sports Found., Inc., Firearms Retailer Survey Report (2013) at 11. *See also* Nat'l Shooting Sports Found., Inc., Commonly Owned: NSSF Announces Over 24 Million MSRs in Circulation (July 20, 2022), https://www.nssf.org/articles/commonly-owned-nssf-announces-over-24-million-msrs-in-circulation/; Nat'l Shooting Sports Found., Inc., Modern Sporting Rifle Comprehensive Consumer Report (July 14, 2022), https://www3.nssf.org/share/PDF/pubs/NSSFMSR-Comprehensive-Consumer-Report.pdf; Nat'l Shooting Sports Found., Inc., Firearms Retailer Survey Report (March 2021), https://www3.nssf.org/share/PDF/pubs/Firearms-RetailerSurvey-Report-2021.pdf; Nat'l Shooting Sports Found., Inc., Sport Shooting Participation in the U.S. in 2020, https://www3.nssf.org/share/PDF/pubs/Sport-Shooting-Participation-2020.pdf.     Washington Post/Ipso survey data indicate that some 16 million Americans own an AR-15. *See The Gun that Divides a Nation*, Washington Post (March 27, 2024) (AR-15 is the best-selling rifle in the United States), available at https://www.washingtonpost.com/nation/interactive/2023/ar-15-america-gun-culture-politics/.

61.     The District's Ban does not stop with AR-platform rifles. It also prohibits any semiautomatic rifle with similar cosmetic features, as well as rifles with a fixed (i.e., non-detachable) magazine that have "the capacity to accept more than 10 rounds, except for an attached

tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition," plus a number of common semiautomatic pistols and shotguns.

62.    To call these firearms "highly unusual in society at large," *Bruen*, 142 S. Ct. at 2143, is to deny reality.

63.    The banned semiautomatic firearms, like all other semiautomatic firearms, fire only one round for each press of the trigger. In other words, they are not machine guns. *See Staples*, 511 U.S. at 602 n.1.

64.    Moreover, the designation "assault weapon" is a complete misnomer, "developed by antigun publicists" in their campaign against lawful firearm ownership. *See Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting).

65.    A comparison to firearms used by the military proves just how disingenuous the "assault weapon" moniker is. While an AR-15 can only fire as often as a person can press its trigger, an M249 light machine gun, commonly used by the U.S. military, can fire between 750 and 1,000 rounds per minute, Squad Automatic Weapon (SAW), M249 Light Machine Gun, Military Analysis Network, https://bit.ly/3tsQGtd, and "heavy" machine guns like the M61 series can fire significantly larger caliber ammunition (20mm) much faster yet (6,000 rounds per minute), M61A1/M61A2 20mm Automatic Gun, MILITARY ANALYSIS NETWORK, https://bit.ly/3ttnemV.

66.    Unlike true "weapons of war,"[1] central among the common uses of firearms banned in the District is defense of self in the home.

---

[1] The idea that war-like weapons or even weapons with a predominate military utility lack Second Amendment protection as set forth in the recent Seventh Circuit opinion in *Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023), flunks the historical test. As Professor Robert Leider explains:

> All decisions and treatises have recognized that arms primarily useful for military service were protected by the Second Amendment, while arms primarily used as

67.     For example, most AR-style firearms are chambered for the .223 Remington round, a relatively inexpensive and very common cartridge that is particularly well suited for home-defense purposes because it has sufficient stopping power when encountering a home intruder but loses velocity relatively quickly after passing through a target or other objects, such as interior walls, thus decreasing the chance that an errant shot will strike an unintended target.

---

concealed weapons in personal conflicts were not. *See, e.g.*, *United States v. Miller*, 307 U.S. 174, 178 (1939) (weapons that constitute "the ordinary military equipment" or that "could contribute to the common defense"); *Aymette v. State*, 21 Tenn. 154, 158 (Tenn. 1840) ("the arms the right to keep which is secured are such as are usually employed in civilized warfare, and that constitute the ordinary military equipment"); *State v. Smith*, 11 La. Ann. 633, 633 (1856) ("The arms there spoken of are such as are borne by a people in war, or at least carried openly."); *Andrews v. State*, 50 Tenn. 165, 179 (Tenn. 1871) ("[T]he usual arms of the citizen of the country, and the use of which will properly train and render him efficient in defense of his own liberties," including, "the rifle of all descriptions, the shot gun, the musket, and repeater"); Thomas M. Cooley, The General Principles of Constitutional Law in the United States of America 282-83 (2d ed. 1891) ("The arms intended by the Constitution are such as are suitable for the general defense of the community against invasion or oppression, and the secret carrying of those suited merely to deadly individual encounters may be prohibited."); 2 Joel Prentiss Bishop, Commentaries on the Criminal Law (4th ed. 1868) ("As to [the Second Amendment's] interpretation, if we look to this question in the light of judicial reason, without the aid of specific authority, we should be led to the conclusion, that the provision protects only the right to "keep" such "arms" as are used for purposes of war, in distinction from those which are employed in quarrels and brawls and fights between maddened individuals….").

Robert Leider, Are Rifles Constitutionally Protected Arms, *Standing His Ground* (April 24, 2024). Professor Leider further explains that

*Heller* never held . . . that individual self-defense was the Amendment's *exclusive* focus. To the contrary, *Heller* explained that "the [English] right secured in 1689 as a result of the Stuarts' abuses was by the time of the founding understood to be an individual right protecting against *both* public and private violence" (emphasis added). As a result, the Seventh Circuit's rule (and that of the Fourth Circuit) that arms most useful in military service are constitutionally unprotected is a complete perversion of the traditional understanding of the Second Amendment.

*Id.*

68.     Although most pistol rounds have less muzzle velocity than a .223 round, they have greater mass, allowing them to maintain velocity after passing through walls and other objects, and pose a substantially greater risk to unintended targets in the home.

69.     An AR-15 rifle chambered in .223 ammunition is ideal to rely on in a self-defense encounter.

70.     Like the AR-15 generally, the specific features the District bans aid in home defense.

71.     A flash suppressor, for example, not only reduces the chances that a home invader will mark his victim's position; it also protects a homeowner against momentary blindness when firing at night in self-defense. David B. Kopel, Rational Basis Analysis of "Assault Weapon" Prohibition, 20 J. Contemp. L. 381, 397 (1994).

72.     Similarly, folding and telescoping stocks increase maneuverability in tight home quarters, *id*. at 398-99, as well as enabling safe storage of defense instruments in accessible spaces.

73.     A telescoping stock also allows a firearm to be better fitted to an individual shooter, thereby enhancing the ability of an individual to use the firearm safely and effectively. In this way, people of different statures can all operate the same firearm by simply adjusting the length of pull of the stock to fit their physical scale.

74.     Pistol grips improve accuracy and reduce the risk of stray shots by stabilizing the firearm while firing from the shoulder. *Id*. at 396.

75.     Thus, pistol grips minimize the chance of inadvertent injury to innocent persons. That should be considered a good thing.

76.     Pistol grips also allow firing one-handed in the event the home defender is wounded in the arm or hand, needs to control a small child, or wants to simultaneously call 911.

77.    Most common semiautomatic firearms, including those banned under the District's law, can accept a detachable magazine.

78.    Detachable magazines not only help law-abiding shooters reload their weapon in stressful self-defense situations, but for some platforms (including the AR-15) they are also required to remedy malfunctions safely and quickly.[2]

79.    Encounters with criminal intruders in the home are not uncommon. Justice Department statistics indicate some 3,700,000 burglaries and home invasions occur annually. *See* Bureau of Justice Statistics Special Report, *National Crime Victimization Study, Victimization During Household Burglary* (September 2010) available at https://bjs.ojp.gov/content/pub/pdf/vdhb.pdf.

80.    According to a Bureau of Justice Statistics report, household members are present for more than a quarter of these events and become victims of violent crimes in more than a quarter of those cases. *Id.*

81.    Studies on the frequency of defensive gun uses in the United States have determined that there are up to 2.5 million instances each year in which civilians use firearms to defend themselves or their property generally without having to fire a shot. Gary Kleck, Marc Gertz, Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun, 86 J. OF CRIM. L. & CRIMINOLOGY 150, 164 (1995). *See also* William English, National Firearms Survey, *supra* at 9 (finding 31.1 percent of firearms owners, or around 25.3 million adult Americans, have used a firearm in self-defense and there are 1.67 million defensive firearm uses a year).

---

[2] For example, to remedy a double-feed jam in a semi-auto pistol or rifle, it is expedient to remove the magazine. *See* Taylor Abney, "How to avoid a double feed disaster," *Guns.com* (Feb. 1, 2021), available at https://www.guns.com/news/how-to-avoid-a-double-feed-disaster; Kevin Creighton, "Clearing a double feed," *ammoman.com* (undated), available at https://www.ammoman.com/blog/how-clear-a-double-feed-type-3-malfunction/.

82.     Respondents to the English survey who indicated that they owned AR-15 styled rifles provided the following reasons for owning these rifles: defense outside the home (34.6%), home defense (61.9%), competitive shooting sports (32.1%), recreational target shooting (66.0%), hunting (50.5%), and other (5.1%). William English, National Firearms Survey, *supra* at 33-34. Note that respondents could choose multiple purposes for which they owned these rifles. *Id.*

83.     Here again, the banned features of firearms mischaracterized as "assault weapons" serve lawful purposes.

84.     Folding and telescoping stocks, for example, allow for safe transportation, including in a hiking pack, an ATV, or a boat. These stocks also ease carrying over long distances while hunting. Both telescoping stocks and protruding grips open hunting and sport shooting to those for whom recoil represents a high barrier to entry.

85.     Detachable magazines have the same benefits in hunting and sport shooting as they do in home defense—improved reloading and remedying of malfunctions.

86.     Additionally, flash suppressors promote accuracy in target shooting and hunting (especially at dawn), as well as militate against temporary blindness when using a firearm in low light conditions.

87.     The banned firearms are also commonly used for competition shooting. One of the faster growing shooting sports in the Nation is Three Gun competition. In Three Gun, competitors use three different firearms—a modern rifle like the AR-15, a pistol and a shotgun. *See* Tony Mandile, "Try This Fun Test Of Speed And Accuracy, Using Rifles, Pistols And Shotguns," *National Shooting Sports Foundation* (undated), available at https://www.nssf.org/shooting/3-gun/. "Matches generally involve courses where the shooter must move through different stages and engage targets in a variety of different positions. Each stage will generally require the use of

different firearms and require the shooter to transition between them." *Id.* "3-gun simulates combat or self-defense situations. A stage provides a certain scenario for using one or more of the guns in a specific sequence." *Id.*

88.     By contrast, the types of firearms deemed "assault weapons" by the District are not commonly used in crime. According to a widely cited 2004 study, these arms "are used in a small fraction of gun crimes." This has long been true. *See* Gary Kleck, Targeting Guns: Firearms and Their Control 112 (1997) (evidence shows that "well under 1 [percent of guns used in crime] are 'assault rifles.'").

89.     Indeed, according to FBI statistics, in 2019 only 364 homicides were known to be committed with *rifles of any type*, compared to 6,368 with handguns, 1,476 with knives or other cutting instruments, 600 with personal weapons (hands, feet, etc.) and 397 with blunt objects. *See* Expanded Homicide Table 8, Crime in the United States (FBI 2019), https://bit.ly/3HdolNd.

90.     The arms banned as "assault weapons" under District law are common in all respects: (1) They are common categorically, as they are all functionally semiautomatic in their operation; (2) they are common characteristically, as they are all popular configurations of arms (e.g., rifles, shotguns, handguns) with varying barrel lengths and common characteristics like pistol grips and the like; and (3) they are common jurisdictionally, lawful to possess and use in the vast majority of states for a wide variety of lawful purposes including self-defense, proficiency training, competition, recreation, hunting, and collecting.

91.     No constitutionally relevant difference exists between a semiautomatic handgun, a shotgun, and a rifle. While some exterior physical attributes may differ (wood vs. metal stocks and furniture, the number and/or location of grips, having a bare muzzle vs. having muzzle devices, different barrel lengths, etc.), and the rounds they fire are of varying mass and velocity, they are,

in all relevant respects, the same: small arms traditionally and commonly possessed by Americans for lawful purposes, particularly self and home defense.

92.     Indeed, they are all common firearms that insert cartridges into a firing chamber, burn powder to expel projectiles through barrels, and are functionally semiautomatic.

93.     They are all common firearms that have the same cyclical rate of fire: one round fired per press of the trigger until ammunition is exhausted or the firearm or feeding device malfunctions.

94.     They are all common under the same jurisdictional analysis.

95.     Further, they are all subject to the same constitutionally relevant history under which DC's Ban is clearly and categorically unconstitutional.

96.     And while some distinct AR-15 rifle models or similar firearms, like those used for competition, are not sold in large numbers by themselves, those too are protected for the same reasons that all semiautomatic rifles, shotguns, and handguns are, just as the latest-generation Glock and Sig Sauer handguns, for example, will be once they are available for sale.

97.     The same goes for firearms prohibited under the District's Ban based on semiautomatic function and characteristics as well as their evolutionary and technological successors.

98.     The "Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding. . . . Thus, even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." *Bruen*, 142 S. Ct. at 2132 (internal citations omitted).

99.     That the District's Ban may outlaw hundreds of discrete configurations of common semi-automatic arms held in respectively smaller numbers than the over-arching category of "assault weapons" as a whole is irrelevant to the constitutional inquiry under *Heller* and *Bruen.*

100.    This is because the banned class of weapons ultimately consists of modern semiautomatic firearms—this is true even though the Ban targets, for example, the type of stock with which the firearm is equipped, or where the magazine may be inserted into the gun.

101.    The District's Ban on "assault weapons" is, therefore, a categorical ban on keeping and bearing semiautomatic firearms that are commonly possessed and used for lawful purposes, including self-defense in the home. As such, the Ban violates the Second Amendment.

102.    *Bruen* confirms that *Heller* already conducted the relevant historical analysis for determining whether a particular arm falls within the Second Amendment's protection and therefore cannot be banned.

103.    Commonly possessed firearms cannot be banned; only those firearms that are both dangerous and unusual (i.e., uncommon) may be prohibited, consistent with the Second Amendment. *Heller,* 554 U.S. at 627; *Bruen,* 142 S. Ct. at 2143.

104.    In *Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007), *aff'd*, *Heller,* 554 U.S. 570, the D.C. Circuit held that once it was determined that a class of weapons are arms "referred to in the Second Amendment, it is not open to the District to ban them." *Id.*

105.    The Supreme Court made two modifications to that analysis. First, the arm must be bearable, meaning that it is capable of being carried by an individual. 554 U.S. at 582.

106.    Second, the arm could be banned if it was both dangerous and unusual. *Id.* at 627.

107.   The bearable arms banned as "assault weapons" under the District's law are neither dangerous nor unusual. Pursuant to *Parker* and *Heller* 'it is not open to the District to ban them." *Parker,* 478 F.3d at 400.

108.   Simply put, arms that are in "common use today" cannot be banned, because common possession necessarily means that they are neither dangerous nor unusual. *Bruen,* 142 S. Ct. at 2143; *Parker,* 478 F.3d at 400.

109.   These principles resolve this case. Once it is determined that the District's law bans arms that are in common use, it follows that the law is unconstitutional—period.

110.   Indeed, the D.C. Circuit noted that the modern-day handgun—and for that matter the rifle and shotgun—is undoubtedly quite improved over its colonial-era predecessor, but it is, after all, a lineal descendant of founding-era weapons, and it thus easily passes *Miller's* standards for protected arms. *Parker,* 478 F.3d at 398.

111.   The D.C. Circuit found that pistols bore a reasonable relationship to the preservation or efficiency of a well-regulated militia and that they were in common use. *Id.* Accordingly, the Court held that the Second Amendment protects the possession of the modern-day equivalent of the colonial pistol. *Id.*

112.   Modern rifles like the AR-15 likewise meet *Miller's* standards: they bear a reasonable relationship to the preservation or efficiency of a well-regulated militia, and they are in common use. It follows that they cannot be banned either.

113.   After all, if an event like the Battle of Lexington and Concord were to occur today, there can be little doubt that most citizen militia members would likely carry a rifle based on the AR platform or similar firearm.

**DC's Ban Violates the Second Amendment.**

114.    "The very enumeration of the right [to keep and bear arms] takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller*, 554 U.S. at 634 (emphasis in original).

115.    "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or future judges think that scope too broad." *Id*. at 634-35.

116.    To justify a law that limits Plaintiffs' Second Amendment rights, the government bears the affirmative burden of proving that the regulation is consistent with our Nation's history and tradition of firearms regulation. *Bruen*, 142 S. Ct. at 2127.

117.    As a matter of law, any statute or regulation that categorically bans ownership of firearms commonly possessed and used for lawful purposes like self-defense is inconsistent with this Nation's history and tradition, and thus violates the Second Amendment. *Id*. at 2128, 2143; *Heller*, 554 U.S. at 624, 627.

118.    The firearms at issue in this case are the sorts of bearable arms in common use for lawful purposes that law-abiding Americans possess at home by the tens of millions. *Cf. Cargill*, 602 U.S. __ (2024) (Sotomayor, J., dissenting) ("semiautomatic rifles" are "commonly available").

119.    And they are, moreover, exactly what American citizens would bring if called to service in the militia, should such be necessary to defend the Nation from insurrection or invasion.

120.    Additionally, in *Heller*, the Supreme Court held that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Id*. at 592. When seconds count, the police may be minutes or hours away, if they come at all. *See, e.g.,*

*Town of Castle Rock v. Gonzales*, 545 U.S. 748 (2005); *Warren v. District of Columbia,* 441 A.2d 1 (1981).

121.    Assuming ordinary citizens are not disqualified from exercising Second Amendment rights, the District must permit them to keep and bear common firearms for lawful purposes like effective self-defense. *See Heller,* 557 U.S. at 635.

122.    The Second Amendment is an "unqualified command." *Bruen*, 142 S. Ct. at 2126.

123.    When a law—like the District's Ban—prevents citizens from owning firearms that are in common use for lawful purposes, including effective self-defense, that law violates the Second Amendment. *Id*.

124.    It cannot be justified by reference to any countervailing governmental interest. *Id*. Moreover, considerations of whether such a law puts a "serious," "substantial," or "onerous" (or any other qualifier) burden on the Second Amendment are immaterial.

125.    The right to keep and bear common firearms guaranteed under the Bill of Rights cannot be subjected to laws and regulations that prohibit ordinary, law-abiding citizens from keeping and bearing common firearms—particularly when such schemes place these citizens under constant threat of criminal sanction for violating them.

126.    The enshrinement of the right to keep and bear arms in the Second Amendment has necessarily taken such "policy choices off the table." *Id*. at 636.

127.    Yet, this is precisely how the District's law operates, completely prohibiting ordinary, law-abiding citizens from exercising their rights in the District with respect to this large class of commonly possessed firearms while placing them under constant threat of criminal sanction.

**COUNT ONE**
**Violation of the Second Amendment to the United States Constitution**
**(42 U.S.C. § 1983)**
**(All Plaintiffs v. All Defendants)**

128.    Paragraphs 1-127 are hereby incorporated herein as if set forth in full.

129.    The Second Amendment to the United States Constitution guarantees ordinary law-abiding citizens of the United States their fundamental right to keep and bear arms, both at home and in public.

130.    Consequently, the Second Amendment prohibits government actions that infringe on the individual right to keep and bear arms.

131.    There is an actual and present controversy between the parties.

132.    The keeping and bearing of arms is a fundamental right necessary to our system of ordered liberty and is also a privilege and immunity of citizenship.

133.    The right to keep and bear arms includes, but is not limited to, the right of individuals to acquire, possess, purchase, receive, transport, and lawfully use commonly owned firearms for all lawful purposes, including self-defense.

134.    The Ban restricts the use of firearms that are commonly used for lawful purposes, and targets  an arbitrary combination of features that do not make a firearm more powerful or more dangerous.

135.    No adequate basis exists to restrict such firearms.

136.    42 U.S.C. § 1983 creates a cause of action against state actors who deprive individuals of federal constitutional rights under color of state law.

137.    Defendants, acting under color of state law at all relevant times, have deprived the fundamental constitutional rights of persons in the District, including Plaintiffs Yzaguirre, G&D, and customers of Plaintiff D&G, and all similarly situated members of Plaintiff SAI, through

enforcement of the District's laws banning the registration and thus possession and use of constitutionally protected arms.

138.    Therefore, as a direct and proximate result of the above infringement of and impermissible burden on the rights of Plaintiffs protected under the Second Amendment, Plaintiffs and all similarly situated District residents and members of SAI have suffered an unlawful deprivation of their fundamental constitutional right to keep and bear arms, and they will continue to suffer such injury unless and until granted the relief they seek herein.

139.    The District's Ban on, *inter alia*, the registration, acquiring, possessing, and selling of so-called "assault weapons" inflicts irreparable harm on Plaintiffs by prohibiting possession of property and conduct protected by the Second Amendment.

140.    Plaintiffs lack an adequate remedy at law for this burden on their Second Amendment rights, and the harm Plaintiffs would suffer from denial of an injunction exceeds any legally cognizable harm an injunction may inflict upon Defendants.

141.    The public interest favors enjoining unconstitutional statutes, including those underlying the District's Ban on, *inter alia*, registering, acquiring, possessing, and selling of so-called "assault weapons."

142.    Thus, injunctive relief is necessary to protect Plaintiffs from the irreparable harm of the ongoing deprivation of Plaintiffs' Second Amendment rights.

143.    Defendants, having acted under color of law, policy, custom or practice to subject Plaintiffs to the deprivation of their right to keep and bear arms, are liable under 42 U.S.C. § 1983 "in an action at law, suit in equity, or other proper proceeding for redress[.]"

144.    For all the reasons asserted herein, Defendants have violated and continue to violate the Second Amendment, warranting relief for Plaintiffs under 42 U.S.C. § 1983.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against Defendants, as follows:

a) A declaratory judgment that the District's Ban on common semiautomatic firearms and all related regulations, policies, and/or customs designed to enforce or implement the same, prevent Plaintiff Yzaguirre and all similarly situated members of Plaintiffs SAI, and customers of Plaintiff G&D from exercising their fundamental right to keep and bear arms, as guaranteed under the Second Amendment to the United States Constitution, and are therefore unconstitutional;

b) A preliminary and permanent injunction prohibiting Defendants, and Defendants' respective employees, officers, agents, representatives, and all those acting in concert or participation with them, from enforcing the District's Ban on the semiautomatic firearms at issue and all related regulations, policies, and/or customs designed to enforce or implement the same, including its prohibition on registering such firearms;

c) Attorneys' fees, expert fees, and costs pursuant to 42 U.S.C. § 1988, and any other applicable law; and,

d) Nominal damages in the amount of $10 against the District of Columbia in favor of each Plaintiff and compensatory damages in the amount of $25,000 against the District of Columbia for denying the Second Amendment rights of Plaintiff Yzaguirre and Plaintiff G&D, or such other amount as may be proven at trial.

d) Any and all other and further legal and equitable relief against Defendants as necessary to effectuate the Court's judgment, or as the Court otherwise deems just and proper.

Respectfully submitted,

**TYLER YZAGUIRRE**

**SECOND AMENDMENT INSTITUTE**

**G & D LLC**

By: */s/ George L. Lyon, Jr.*
George L. Lyon, Jr. (D.C. Bar No. 388678)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
202-669-0442, fax 202-483-9267
gll@arsenalattorneys.com

Matthew J. Bergstrom (D.C. Bar. No. 989706)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
800-819-0608
mjb@arsenalattorneys.com

*/s/ Edward M. Wenger*
Edward M. Wenger (D.C. Bar No. 1001704)
Holtzman Vogel Baran
Torchinsky & Josefiak PLLC
2300 N Street NW, Suite 643A
Washington, DC 20037
(202) 737-8808 (phone)
(540) 341-8809 (facsimile)

Ken Daines (D.C. Bar No. 1600753)
Andrew Pardue (D.C. Bar No. 7650715)
Holtzman Vogel Baran
Torchinsky & Josefiak PLLC
15405 John Marshall Hwy
Haymarket, VA 20169
(540) 341-8808 (phone)
(540) 341-8809 (facsimile)

Dated:  June 25, 2024                    *Attorneys for Plaintiffs*